UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                       :

CONGELADOS DEL CIBAO,             :

                  Plaintiff,    :

                       :         19-cv-7596 (LJL)

      -v-               :

                       :      OPINION AND ORDER

3 KIDS CORPORATION and         :
DOMINICK CHIAPPONE *in his individual capacity*,  :

                       :

             Defendants.   :

                       :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _05/03/2022_

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Congelados del Cibao ("Congelados" or "Plaintiff") brings claims against

Defendants 3 Kids Corporation ("3 Kids") and Dominick Chiappone ("Chiappone" and,

collectively with 3 Kids, "Defendants"), alleging that Defendants failed to pay Plaintiff for

several shipments of lobster tails. Dkt. No. 5. Plaintiff brings a breach of contract claim ("Count

I") and quantum meruit and unjust enrichment claims ("Count II") against Defendants, as well as

a fraud in the inducement claim ("Count III") against Chiappone. Dkt. No. 5.

      Plaintiff moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 on

Counts I and II. Dkt. No. 77. Chiappone moves for summary judgment on Count III. Dkt. No.

76. For the following reasons, Plaintiff's motion for summary judgment is granted in part and

denied in part, and Chiappone's motion for summary judgment is granted.

## BACKGROUND

      The following facts are undisputed for purposes of this summary judgment motion.

      Congelados is located in the Dominican Republic ("DR"). It distributes and exports

frozen foods, including frozen lobster tails harvested from the sea near the DR. Dkt. No. 77-5

("Joint Statement") ¶ 1.  Pedro Nunez is the president and one of four owners of Congelados and is a resident of the DR.  *Id.* ¶ 3.  3 Kids, which transacted business from Middletown, New York, imported seafood and engaged in the purchase, processing, and subsequent resale of seafood products.  *Id.* ¶ 2.  Dominick Chiappone was an owner and chairperson of 3 Kids since at least 2002.  *Id.* ¶ 5.  Janet Chiappone was an employee of 3 Kids from August 4, 2008 to on or about March 16, 2020.  *Id.* ¶ 7.

Congelados and 3 Kids had a business arrangement for Congelados to sell and deliver frozen lobster tails to 3 Kids in exchange for payment beginning in approximately 2014.  *Id.* ¶ 8. In or about October 2014, Congelados and 3 Kids entered into an agreement for the purchase and sale of lobster tails from the DR.  In an email from Dominick Chiappone to Pedro Nunez dated October 24, 2014, Chiappone stated:  "Good Afternoon Pedro, As per our Discussion this morning we agree to pay $13.25 per lb for the lobster tails.  We also will pay the tax of $0.50 & the freight."  *Id.* ¶ 9.

Since then and through 2017, Congelados sold lobster tails to 3 Kids several times a year in exchange for payment.  *Id.*  In particular, Congelados sold over 540,000 pounds of lobster tails to 3 Kids in at least fourteen separate transactions from 2014 through 2017.  *Id.* ¶ 10.  According to the parties' agreement, Congelados would have the lobster shipped from the DR to 3 Kids in the United States and send an invoice for payment.  *Id.* ¶ 11.  3 Kids would pay the invoice, usually in multiple installments.  *Id.*

The instant dispute involves the last three shipments of lobster tails from Congelados to 3 Kids, which were made in 2016 and 2017.  Each shipment was made pursuant to an invoice issued by Congelados to 3 Kids listing the date of the shipment, the port of loading in the DR and port of discharge in New York, the net weight of the frozen lobster tail being shipped, a price per

unit FOB, and a total price.  Payment terms were listed as "50% Advance, 50% After Receive

Documents."  Dkt. No. 77-2 at 84, 86, 88.

- Invoice No. 79:  On or around October 20, 2016, Congelados had approximately 27,706 pounds of frozen lobster tail shipped to 3 Kids.  Joint Statement ¶ 12.  Congelados sent Invoice No. 79 to 3 Kids, seeking payment in the amount of $346,326.25 for the lobster tails shipped to 3 Kids on or around October 20, 2016.  *Id.* ¶ 13.  3 Kids received the lobster tails subject to Invoice No. 79.  *Id.* ¶ 14.

- Invoice No. 92:  On or around June 2017, Congelados had approximately 41,990 pounds of frozen lobster tail shipped to 3 Kids.  *Id.* ¶ 15.  Congelados sent Invoice No. 92 to 3 Kids seeking payment in the amount of $573,168.96 for the lobster tails shipped to 3 Kids on or around June 2017.  *Id.* ¶ 16.  3 Kids received the lobster tails subject to Invoice No. 92.  *Id.* ¶ 17.

- Invoice No. 94:  On or around June 29, 2017, Congelados had approximately 41,787 pounds of frozen lobster tail shipped to 3 Kids.  *Id.* ¶ 20.  Congelados sent Invoice No. 94 to 3 Kids seeking payment for the lobster tails shipped to 3 Kids on or around June 29, 2017.  *Id*. ¶ 21.  3 Kids received the lobster tails subject to Invoice No. 94.  *Id*. ¶ 22.  On July 12, 2017, Janet Chiappone sent an email to Pedro Nunez requesting that Invoice No. 94 be revised to reflect the weight of the lobsters it received.  *Id.* ¶ 23.  Congelados subsequently sent a revised Invoice No. 94 to 3 Kids, as requested, seeking payment in the corrected amount of $570,398.01.  *Id.* ¶ 24.

Consistent with the parties' past practices, 3 Kids began to pay Congelados in

installments for the lobster tails it had received.  Specifically, on or around September 14, 2017,

3 Kids paid Congelados $80,000 towards Invoice No. 79.  *Id.* ¶ 25.  In response, on September

27, 2017, Congelados sent an email to 3 Kids, listing the total amount outstanding on the three

invoices and a total outstanding balance owed to Congelados as $1,418,756.02.  *Id.* ¶ 26.  The

email sent by Pedro Nunez on September 27, 2017 identified the following balances for each

invoice:

- Invoice No. 79: $266,326.25;

- Invoice No. 92: $561,138.06; and

- Invoice No. 94: $591,291.71.

*Id.* ¶ 27.  In the cover email, Congelados noted that "there is an invoice with almost one year of credit and we can not keep a credit of that duration" and asked 3 Kids "to improve your method of payment."  Dkt. No. 77-2, Ex. 19, Ex. A at 1.

That same day, Janet Chiappone, on behalf of 3 Kids, sent an email to Congelados confirming the balances for Invoice No. 79 and Invoice No. 92, but stating that for Invoice No. 94, "we had asked for a revised invoice to reflect the weight we received and you sent that to us (which I have attached)," and asking that Congelados "Please review and kindly revise your balances."  *Id.*, Ex. C; *see also* Joint Statement ¶¶ 29–32.  The revised Invoice No. 94 attached to Janet Chiappone's September 29 email identifies the amount owed on Invoice No. 94 as $570,398.01, the same figure as on the revised invoice of July 12, 2017.  Dkt. No. 77-2, Ex. 19, Ex. C; *see also* Joint Statement ¶ 33.

3 Kids continued to make some payments towards Invoice No. 79.  On October 12, 2017, 3 Kids paid Congelados $25,000 towards Invoice No. 79.  Joint Statement ¶ 35.  Two weeks later, on October 25, 2017, 3 Kids paid Congelados $40,000 towards Invoice No. 79.  *Id.* ¶ 36.  Shortly thereafter, on November 21, 2017, 3 Kids paid Congelados another $20,000 towards Invoice No. 79.  *Id.* ¶ 37.

Thereafter, payments slowed.  On December 6, 2017, Nunez of Congelados sent Chiappone of 3 Kids a message on WhatsApp, asking to speak to Chiappone about outstanding payments.  *Id.* ¶ 38.  Chiappone responded by stating "I'm sending what I can."  *Id.*  Nine days later, on December 15, 2017, Nunez sent Chiappone a message on WhatsApp stating, "I need to talk to you urgently."  *Id.* ¶ 39.  Chiappone responded on the same day, agreeing to send money for the lobster tails the following Tuesday.  *Id.*  The following Tuesday, December 20, 2017, 3

Kids paid Congelados $20,000 towards Invoice No. 79.  *Id.* ¶ 40.  A little more than a week later, on December 28, 2017, 3 Kids paid Congelados $25,000 towards Invoice No. 79.  *Id.* ¶ 41.

Some payments continued on Invoice No. 79 in January and February 2018.  On January 23, 2018, Nunez emailed Chiappone requesting payments owed on the purchase of the lobster tails; Nunez also reminded Chiappone that he needed the money to pay the interest earned on the loans he took out to cover the capture of the lobster.  *Id.* ¶ 42.

On January 24, 2018, Chiappone responded by email to Nunez's email of January 23, 2018.  Chiappone apologized for the delay and agreed to send Congelados a payment by Friday. *Id.* ¶ 43.  On January 26, 2018, 3 Kids paid Congelados $20,000 towards Invoice No. 79, *id.* ¶ 44; on February 6, 2018, 3 Kids paid Congelados $20,000 towards Invoice No. 79, *id.* ¶ 45; and on February 21, 2018, 3 Kids paid Congelados $20,000 towards Invoice No. 79, *id.* ¶ 46.

On March 1, 2018, Nunez emailed Chiappone asking that he make a payment on the outstanding balance.  *Id.* ¶ 47.  Nunez reminded Chiappone that he pays 1.5% per month in interest on the loans.  *Id.*  Chiappone forwarded Nunez's March 1, 2018 email to Janet Chiappone, who responded directly to Nunez by email.  *Id.* ¶ 48. Janet Chiappone provided Nunez with her record of the amounts owed on Invoice Nos. 79, 92, and 94.  *Id.*  She stated:

> Pedro,
>
> I have the following balances:
>
> Invoice 79: $76,326.25 (We sent a wire on 2/21/18 for $20,000) which I have attached.
>
> Invoice 92: $561,138.05 (OK)
>
> Invoice 94: $573,441.96 (see your invoice attached).
>
> We will send you money as soon as we can.
>
> Thank you.

*Id.*

Only three more payments followed on Invoice No. 79, all in response to demands from Congelados.  *Id.* ¶¶ 49–50, 52–53, 58–59.  3 Kids made no payments on the other two invoices. The first of those payments was in mid-March 2018; on March 12, 2018, Nunez emailed Chiappone, again demanding payment on the outstanding balance, and Chiappone responded on the same day, stating, "Sorry, Pedro. I will send what I can."  *Id.* ¶ 49.  Two days later, on March 14, 2018, 3 Kids paid Congelados $20,000 towards Invoice No. 79.  *Id.* ¶ 50.

Meanwhile, on March 15, 2018, Janet Chiappone sent Nunez an email which set forth 3 Kids' calculation of the amounts owed to Congelados under Invoice No. 92, indicating that the "total due" to Congelados for Invoice No. 92 was $522,105.45 (contrary to Congelados' March 1, 2018 statement reflecting a sum of $561,138.06).  *Id.* ¶ 51; *see also* Dkt. No. 77-3 at 51.

The second of those payments was in late March; on March 22, 2018, Nunez sent Chiappone an email reminding him to make a payment on the outstanding balance.  Joint Statement ¶ 52.  On April 11, 2018, 3 Kids paid Congelados $20,000 towards Invoice No. 79. *Id.* ¶ 53.

The third of those payments—the last payment 3 Kids made to Congelados—was in May 2018; on April 23, 2018, Nunez emailed Chiappone, asking him for a payment.  *Id.* ¶ 54.  Nunez again reminded Chiappone that he needed "the money to be able to pay the loans in the bank and keep buying products."  *Id.*  Chiappone forwarded Nunez's April 23, 2018 email to Janet Chiappone to let her know that Nunez was looking for a payment and that if they had any money, they should send it to him.  *Id.* ¶ 55.  On April 26, 2018, Nunez sent Chiappone a message on WhatsApp, stating, "Hello."  *Id.* ¶ 56.  On April 27, 2018, Chiappone responded by WhatsApp, stating, "Hi Pedro things are slow I will send what I can," referring to the outstanding balance owed to Congelados.  *Id.*  During the summer of 2018, 3 Kids stated that it

would make payments towards the balances owed to Congelados on Invoice Nos. 79, 92, and 94.
*Id.* ¶ 57.  On May 18, 2018, Nunez emailed Chiappone, again requesting that he make a payment towards the outstanding balance emphasizing the urgency of the matter.  *Id.* ¶ 58.  Chiappone responded, stating, "Good morning Pedro. I am sorry for the delays. I will send something when I can," referring to making a payment when there is money in the account.  *Id.*  On May 30, 2018, 3 Kids paid Congelados $10,000 towards Invoice No. 79.  *Id.* ¶ 59.

On September 24, 2018, Nunez sent Chiappone an email, stating, "Hi Dominick.  We informed you that on our last visit to you in May, you promised that 45 days after our meeting, you would make an important payment every week to the outstanding balance that you have with Congelados del Cibao . . . I need the money and I have been very understandable with you but I cannot wait any longer, how you know I have to pay 1.5% interest to the bank every month or about USD 18,131.34."  *Id.* ¶ 60.  On September 27, 2018, Chiappone sent Nunez a message on WhatsApp, stating, "Good morning Pedro I received your email sorry for the delay I have been travelling I am working on it for you," referring to his working to get money to pay off the outstanding balance to Congelados.  *Id.* ¶ 61.

Since September 29, 2017, 3 Kids has not made any payments towards the balances; it has never made any payment on the balances owed on Invoice Nos. 92 and 94.  *Id.* ¶ 34.

In December 2019, 3 Kids closed its doors in Middletown, New York when the facility was sold.  *Id.* ¶ 67.  3 Kids ceased operations in March 2020.  *Id.*  From 2016 until 2020, when 3 Kids stopped doing business, 3 Kids always indicated that it intended to pay off the balance of Invoice Nos. 79, 92, and 94 owed to Congelados.  *Id.* ¶ 64.

## PROCEDURAL HISTORY

Plaintiff filed his complaint against Defendants on October 14, 2019.  Dkt. No. 5.  The complaint alleges three causes of action: (1) breach of contract, (2) quantum meruit and unjust

enrichment, and (3) fraud in the inducement.  *Id.*  Defendants answered on November 20, 2019.
Dkt. No. 12.

On November 19, 2021, both Plaintiff and Chiappone moved for partial summary
judgment.  Dkt. Nos. 76–77.  The parties filed opposition papers on December 13, 2021.  Dkt.
Nos. 80–81.  The parties filed reply papers on December 21, 2021.  Dkt. Nos. 82–83.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material fact and the moving party is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for
these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n
issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for
the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)
(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether
there are any genuine issues of material fact, the Court must view all facts "in the light most
favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.
2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact
exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).
If the movant meets its burden, "the nonmoving party must come forward with admissible
evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."
*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the
facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.
2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Nor may the
non-moving party "rely on conclusory allegations or unsubstantiated speculation."  *F.D.I.C. v.*

*Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-moving party must also demonstrate more than "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented.  Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  L.R. 56.1(a).  Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be

admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).

## DISCUSSION

### I.       Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment in its favor on its breach of contract claim as well as on its unjust enrichment and quantum meruit claims.

####       A.       Breach of Contract

The parties agree that Plaintiff's breach of contract claim is governed by the United Nations Convention on Contracts for the International Sale of Goods, S. Treaty Doc. No. 98-9 (1983), *reprinted in* 15 U.S.C.A. App. ("CSIG" or the "Convention"), because it arises from an agreement for the sale of goods, and Congelados and 3 Kids do business in the Dominican Republic and the United States, respectively, which are both Contracting States under the Convention.  "The UN CISG . . . is an international treaty that 'governs sales contracts between parties from different signatory countries.'"  *Nantong Sanhai Garment Co. v. Fab Mill Inc.*, 2022 WL 540756, at *2 (S.D.N.Y. Feb. 23, 2022) (quoting *Transmar Commodity Grp. Ltd. v. Cooperativa Agraria Indus. Naranjillo Ltda.*, 721 F. App'x 88, 89 (2d Cir. 2018) (internal quotation marks and citation omitted)).  "[T]he UN CISG applies automatically unless the parties expressly opt-out."  *Id.*

"Article 9(2) [of the CISG] evinces 'a strong preference for enforcing obligations and representations customarily relied upon by others in the industry.'"  *Transmar*, 721 F. App'x at 90 (quoting *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories, Inc.*, 201 F. Supp. 2d 236, 281 (S.D.N.Y. 2002), *rev'd in part on other grounds*, 386 F.3d 485 (2d Cir. 2004)).

The elements of a claim for breach of contract under the CISG are: (1) "the existence of a valid and enforceable contract containing both definite and certain terms," (2) "performance by

plaintiff," (3) "breach by defendant," and (4) "resultant injury to plaintiff." *Ningbo Yang Voyage Textiles Co., Ltd. v. Sault Trading*, 2019 WL 5399973, at *3 (E.D.N.Y. Sept. 10, 2019) (internal quotation marks omitted) (quoting *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 924 (N.D. Ill. 1999)).  The elements of the claim under the CISG are "the same elements as those under New York State law."  *Id.* (citing *24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 429 F.3d 39, 42 (2d Cir. 2005)).  "Under the CISG, like New York law, a contract is formed through offer and acceptance, evidencing an agreement to which both parties are bound." *Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*, 2016 WL 4532911, at *3 (S.D.N.Y. Aug. 23, 2016) (citing CISG arts. 14, 18).  At the same time, however, unlike New York law, which "has long applied the 'four corners rule' that prohibits extrinsic evidence unless the face of the document is ambiguous," "Article 8(3) requires courts to give 'due consideration' to extrinsic evidence of the reasonable expectations of the parties if their subjective intent is at odds."  *Transmar*, 721 F. App'x at 90.

Plaintiff is entitled to summary judgment on its breach of contract claim.  The undisputed evidence demonstrates that the parties entered into agreements for the three shipments of lobster at issue, *see* Joint Statement ¶¶ 13, 16, 24; that Plaintiff performed by delivering the lobster, *see id.* ¶¶ 14, 17, 22; and that 3 Kids failed to pay Plaintiff in full for those deliveries according to their agreements, thereby breaching the agreements and injuring Plaintiff, *see id.* ¶ 62.  The Court discusses these elements in greater detail in turn.

First, there is no genuine issue that when Congelados sent Invoice Nos. 79, 92, and 94 along with the three shipments of lobster tails to 3 Kids, and 3 Kids accepted the invoices and the shipments, each of the elements of offer and acceptance were satisfied.  Each of the invoices— which operate as the offers—indicate the goods, the quantity and the price.  *See Shantou*, 2016

WL 4532911, at *3 ("The issuance of these Sales Confirmations and their signature by a representative of [defendant] thus constitutes both an offer and acceptance."); *Carey v. Mui-Hin Lau*, 140 F. Supp. 2d 291, 297 (S.D.N.Y. 2001) ("Because defendants did not object to the invoices, they accepted the charges as the fair and reasonable value of plaintiff's services."); CISG art. 14(1) ("A proposal for concluding a contract . . . constitutes an offer if it . . . indicates the intention of the offeror to be bound in case of acceptance . . . [and] indicates the goods[,] . . . the quantity and the price.").  In this case, not only did 3 Kids accept the shipments of lobster tails pursuant to the invoices, but it expressly agreed with Congelados regarding the amounts due under those invoices.  *See* Joint Statement ¶¶ 28, 33; Dkt. No. 77-2 at 105, 108.  3 Kids all but concedes this:  "In the instant mater [sic] the parties did exchange forms which supposedly encompassed an understanding as to the value of the product." Dkt. No. 81 at 7.  3 Kids argues that there is a triable issue as to whether the parties entered into any definite contracts by pointing to separate invoices for each of the three different shipments, but there is no dispute as to which are the operative ones.  3 Kids concedes, for purposes of this motion, that it accepted delivery pursuant to specific invoices that set forth a price of $346,326.25, $573,168.96, and $570,398.01, respectively.  Joint Statement ¶¶ 13–24.

Moreover, if there were any doubt that Congelados and 3 Kids formed an enforceable agreement at least with respect to Invoice No. 79, that doubt would be dispelled by 3 Kids' repeated, but insufficient, installment payments on that invoice.  In effect, by making payments on a part of the invoice and by recognizing that such payments were only partial, 3 Kids indicated its assent to make the remainder of the payments.  *See Residential Services Validated Publications v. Carus*, 2006 WL 1026669, at *5 (E.D.N.Y. Apr. 19, 2006) ("Federal Courts within this Circuit and New York State Courts have held that 'an agreement to pay an

indebtedness may also be implied if the debtor makes partial payment.  The partial payment is considered acknowledgment of the validity of the account.'" (alteration adopted) (quoting *Kramer Levin Nessen, Kamin & Frankel v. Aronoff*, 638 F. Supp. 714, 720 (S.D.N.Y. 1986))). With regard to Invoice Nos. 92 and 94, although 3 Kids never made any payments towards those invoices, it repeatedly confirmed that it owed Congelados those balances.  *See, e.g.*, Joint Statement ¶¶ 27–33, 48–49, 57, 62–64.  These repeated assurances further demonstrate 3 Kids' understanding that the parties had reached concrete agreements with regard to each of the invoices.

Second, there is no genuine dispute as to whether Congelados performed its duties under the contracts by sending shipments of lobster under each of the at-issue invoices.  3 Kids argues that there is a triable issue because of "the poor quality of the product, and the losses [3 Kids] sustained as a result of the inferior product."[1]  Dkt. No. 81 at 7.  That argument, however, fails to present a genuine issue of material fact.  3 Kids asserts that the parties' agreements were limited to specific quality lobster tails, the parties "agreed that .50 cents per pound was being assessed to pay for the taxes Congelados would pay in the Dominican Republic," that "[t]his tax price point agreement was part of a clear understanding that 3 Kids Corporation Inc was going to receive #1 quality product," and that "[w]hen 3 Kids Corporation received #2 and #3 product they

---

[1] 3 Kids frames this argument as going to lack of proper consideration and by extension lack of any enforceable contracts.  *See* Dkt. No. 81 at 7.  Such an argument does not hold water; as set forth above, the record is clear that Congelados sent 3 Kids Invoice Nos. 79, 92, and 94, along with the corresponding shipments of lobster tails, and that 3 Kids accepted the shipments pursuant to those invoices.  At that point, an enforceable contract was formed.  The question therefore is not whether there was consideration for the promise to pay—there plainly was—but whether Congelados' imperfect performance constitutes a breach of the parties' agreements.  The Court therefore construes 3 Kids' argument as suggesting that while the parties may have had an agreement pursuant to which Congelados would ship 3 Kids lobster tails in exchange for payment, Congelados breached this agreement by shipping goods that did not meet what 3 Kids asserts were the bargained-for quality specifications.

complained." Dkt. No. 81 at 7–8.  The record, however, even viewed in the light most favorable to 3 Kids, does not support that the parties' agreements were limited to the shipment of "#1 quality product" or that Congelados' shipments constituted breaches of the agreements.  The governing invoices contain no references to the quality of the lobsters to be shipped.  *See* Dkt. No. 77-2, Exs. 15–17.  Rather, in support of its argument that the parties had a "clear understanding that 3 Kids Corporation Inc was going to receive #1 quality product," 3 Kids cites two types of evidence: communications between the parties about payment of taxes on top of payment for the product and communications between the parties about 3 Kids' dissatisfaction with the quality of product they were receiving.

The record contains several emails—all of which predate the invoices at issue here—that seem to reflect an intention on 3 Kids' part to pay "taxes" on top of agreed-upon price per pound of lobster.  For example, an October 24, 2013 email from Chiappone to Nunez states:  "As per our Discussion this morning we agree to pay $ 13.25 per lb for the lobster tails.  We will also pay the tax of .50 & the freight."  Dkt. No. 81-3 at 1.  An October 30, 2015 email from Janet Chiappone to Pedro, copying Chiappone, similarly references separate balances for product and for taxes for specific shipments:  "Please note the product balance is now paid off ($563,058), however only $1,942 has been paid towards taxes.  We show the remaining tax balance being $18,912, of which we will send a future wire for."  *Id.* at 2.  A third email, sent on April 11, 2016 by Janet Chiappone to Nunez, again copying Chiappone, states:  "Attached is the wire confirmation for the payment we did today for Invoice #45.  This will pay off Invoice 45 an the taxes for it."  *Id.* at 3.  There are several other emails in the same vein.  *See id.* at 5–7.  The record also contains a series of texts between Chiappone and Nunez; on April 25, 2015, during a conversation about pricing, Chiappone states:  "The tax is always separate.  I am just talking

14

about price per pound.  Can we make it 13." Dkt. No. 81-7.  These communications can be read

to show that, at least for some of the shipments Congelados sent to 3 Kids, 3 Kids understood

that their agreement was to pay Congelados for taxes on top of the price for the product.  While

the emails do not refer to the invoices at issue here, viewing the evidence in the light most

favorable to 3 Kids, the emails could perhaps support the inference that the parties' standard

business practice was to incorporate a payment for taxes on top of the payment for the product

for all the shipments.  That, however, does not get 3 Kids where it needs to be.  The emails

reflect no understanding—even on 3 Kids' part—that "[t]his tax price point agreement was part

of a clear understanding that 3 Kids Corporation Inc was going to receive #1 quality product," as

3 Kids argues.  Dkt. No. 81 at 3–4.  In fact, only one of the cited emails references both quality

and taxes in conjunction, and that reference indicates that the agreement to pay taxes was not tied

to an understanding regarding quality.  In a December 22, 2016 email from Chiappone to Nunez,

Chiappone complains about the quality of product he has been receiving, and he suggests that

"[i]f [Nunez] think[s] it will help we can go back to the old way using the following prices.

Number 1 quality 5 through 8 oz. 13.00 per Lb. plus the .50 for taxes.  Number 1 quality 9

through 20-up 12.00 per Lb. plus .50 for taxes[.]  Number 2 quality 11.00 for all sizes plus

taxes." *Id.* at 6.  Far from suggesting that the tax agreement "was part of a clear understanding

that 3 Kids Corporation Inc was going to receive #1 quality product," this email indicates that 3

Kids anticipated paying taxes on top of whatever the agreed-upon price for the product was,

regardless of whether the product was "Number 1 quality" or "Number 2 quality."  The evidence

that 3 Kids also anticipated paying taxes for some shipments therefore not only does not speak to

whether the parties agreed that 3 Kids would pay taxes for the at-issue shipments but also does

not support an inference that the at-issue agreements were only for the shipment of Number 1 quality lobster, even drawing all inferences in favor of 3 Kids.

The record also contains several emails between the parties reflecting 3 Kids' dissatisfaction with the quality of the product it was receiving from Congelados in some of the shipments.  On July 15, 2016, Chiappone emailed Nunez, saying:  "I can buy number one tails in boxes for $ 12.00 per Lb. for the large tails 9oz. & up. . . .  Plus, there are number 2 & 3 quality mixed in each shipment.  So I cannot pay so much for the tails from The Dominican in bul.  I have to wait a week or two to see what price it levels out at but I think the price will be between 10.00 to 11.00.  I am not sure yet but this is what it is looking like.  Please keep this in mind when buying."  Dkt. No. 81-3 at 4.  On December 22, 2016, in the email referenced above, Chiappone again emailed Nunez about the quality of the lobster he was receiving:

> I am writing to you so we can correct a problem that the Boats are creating.  I have been noticing that with the last 4 containers the breakdowns have been getting worse.  I need you to try to correct this as I have lost money on the last couple of containers.  Let me explain your invoice number 72 had 28% number 2 quality and 5.9% number 3 quality.  Of the remaining 66% that were number 1 quality 70% of those were 10oz. & up which sell for about what I pay to you with the taxes & freight so I lose a little on every pound of them & I lose a lot on the number two & three quality.  I have been buying other people's product to help pay you what I am loosing [sic] on these shipments.  I need you to get tuff with he boats & get me back to 60% or more 5-9oz.  this will help me catch up with your payments.  I can sell the large tails but I need the smaller sizes to average out the container costs.  If you think it will help we can go back to the old way using the following prices.
>
> Number 1 quality 5 through 8 oz. 13.00 per Lb. plus the .50 for taxes.
>
> Number 1 quality 9 through 20-up 12.00 per Lb. plus .50 for taxes
>
> Number 2 quality 11.00 for all sizes plus taxes

*Id.* at 6.  Chiappone, in his capacity as 3 Kids' 30(b)(6) witness, also testified about quality issues with Congelados' shipments, testifying that they had such issues "[f]rom the beginning," and that he "let him know about it and, you know, we still – we kept taking more," but "still

complained every time we found an issue." Dkt. No. 81-4 at 46–47. He testified that he

complained to Nunez, and "[b]asically every time [he] complained," Nunez would tell him,

"Yeah, don't worry about it. Don't worry about it." *Id.* at 48. This evidence plainly can support

an inference that 3 Kids was dissatisfied with the quality of the lobster sent by Congelados in

some of the shipments. Once again, however, this does not get 3 Kids where it needs to be in

demonstrating that a triable issue exists with regard to whether 3 Kids breached the contracts

between the parties. 3 Kids points to no evidence that the contracts at issue provided that the

lobster would be of "#1 quality"; the emails and deposition testimony indicate only that 3 Kids

was unhappy with the quality of the lobster and hoped that future shipments would be better—or,

at least, cheaper. Moreover, the emails contain no reference to the at-issue shipments here; to

infer from those emails that the three shipments here also contained inferior product would

require a speculative leap unsupported by the record.

  Even assuming that the evidence with regard to an agreement to pay taxes or the evidence

of 3 Kids' dissatisfaction with the quality of some of the shipments could support an inference

that the parties' at-issue contracts were limited to "#1 quality" lobster tails—and that Congelados

delivered inferior quality lobster tails for each of those shipments—there is still no triable issue

that valid contracts existed. "Under the CISG, '[t]he seller must deliver goods which are of the

quantity, quality and description required by the contract,'" and "'the goods do not conform with

the contract unless they . . . [p]ossess the qualities of goods which the seller has held out to the

buyer as a sample or model.'" *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1028 (2d Cir.

1995) (quoting CISG arts. 35, 36). "[I]f the breach is 'fundamental,' the buyer may either

require delivery of substitute goods or declare the contract void and seek damages."[2] *Id.* (citing

---

[2] A breach is fundamental "if it results in such detriment to the other part as substantially to

17

CISG arts. 46, 49). However, "in cases where the seller has delivered the goods, the buyer loses the right to declare the contract avoided unless he does so . . . within a reasonable time," meaning "(i) after he knew or ought to have known of the breach; (ii) after the expiration of any additional period of time fixed by the buyer in accordance with paragraph (1) of article 47; or (iii) after the expiration of any additional period of time indicated by the seller in accordance with paragraph (2) of article 48, or after the buyer has declared that he will not accept performance." CISG art. 49. Here, the record is devoid of any evidence that, with regard to any of the at-issue shipments, 3 Kids either demanded delivery of substitute goods or declared the contract void. Rather, as 3 Kids concedes, it accepted delivery of the lobster, and even once it learned of the quality of the lobster, it still did not reject the shipments or void the contract but merely let Congelados know that it would prefer better or cheaper shipments in the future. *See Shantou*, 2016 WL 4532911, *4 (buyer's acceptance of the goods without complaining of the timeliness of the deliveries resulted in its waiver of the "right to avoid payment of the sums owed to [the seller] based upon alleged late deliveries"); *Carey*, 140 F. Supp. 2d at 297 ("Because defendants did not object to the invoices, they accepted the charges as the fair and reasonable value of plaintiff's services.").

Thus, even assuming that the contracts at issue required the shipment of #1 quality lobster and that Congelados, in delivering inferior lobster, did not fulfill this requirement, Congelados is still entitled to summary judgment on its breach of contract claim because the record is devoid of any evidence that 3 Kids demanded substitute goods or sought to void the contract within any reasonable time—indeed, until this litigation arose.[3]

---

deprive him of what he is entitled to expect under the contract, unless the party in breach did not foresee and a reasonable person of the same kind in the same circumstances would not have foreseen such a result." *Id.* (internal quotation marks omitted) (quoting CISG art. 25).

[3] Although the Court grants summary judgment on Plaintiff's breach of contract claim, it does so only against Defendant 3 Kids, and not against Defendant Chiappone. As this Court has already

### B.      Unjust Enrichment and Quantum Meruit

Plaintiff also moves in the alternative for summary judgment on its unjust enrichment and quantum meruit claims:  "In the event the Court determines that no contract exists between the parties, Plaintiff, in the alternative, moves for summary judgment on its quantum meruit and unjust enrichment claims."  Dkt. No. 77-7 at 14.  Because the Court has found, as a matter of law, enforceable contracts between the parties, Plaintiff's claims for unjust enrichment and quantum meruit are dismissed.  *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) ("[Q]uantum meruit and unjust enrichment are not separate causes of action."); *UETA Latinamerica, Inc. v. Zafir*, 10 N.Y.S.3d 566, 568 (2d Dep't 2015) (stating that claim for unjust enrichment "only applies in the absence of an express agreement, and is not really a contract at all, but rather an equitable obligation imposed in order to prevent a party's unjust enrichment"); *Christian Broad. Network, Inc. v. Busch*, 2006 WL 2850624, at *8 (E.D. Va. Oct. 3, 2006) ("Unjust enrichment claims arise 'when there is no contractual relationship.'" (quoting *Aerotek, Inc. v. Tyonek Native Corp.*, 2005 WL 3372872, at *3 (E.D. Va. Dec. 8, 2005))); *see also Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp.

---

held:

> New York law treats a corporation and its owners independently; that a corporation might be liable on a debt or might promise to make a payment does not mean that its owners are so obligated in their personal capacity. *See Sesa, Inc. v. Terrafina.*, 2020 WL 6382919, at *4 (S.D.N.Y. Oct. 30, 2020); *SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.*, 2013 WL 5366373, at *11 (S.D.N.Y. Sept. 25, 2013) (holding that to warrant piecing the corporate veil and finding a corporation's owner liable in his or her personal capacity, a plaintiff "must do more than conclusorily state that the shareholder or officer exercises domination and control over the corporation. Rather, a plaintiff must allege specific facts showing that the shareholder or officer is doing business in his or her individual capacity without regard to corporate formality"). . . . [T]he face of the complaint does not reflect any claim that Chiappone is liable on an alter ego basis.

Dkt. No. 46 at 5.  The record is devoid of any evidence suggesting that Chiappone entered into contracts with Congelados in his individual capacity.  Any breach of contract claim against him is therefore dismissed.

2d 1, 4 (S.D.N.Y. 2004) ("If a valid, enforceable contract existed between the parties, then

[plaintiff] cannot recover under a theory of unjust enrichment. However, if no valid contract was

in place regarding the sale of the goods, [plaintiff] has failed to state a claim for relief under the

theory of unjust enrichment because, absent a contract, the benefit that [defendant] garnered

from selling the merchandise was not at [plaintiff]'s expense.").

## II.   Defendant Chiappone's Motion for Summary Judgment

Defendant Dominick Chiappone moves for summary judgment on Congelados' claim of

fraud in the inducement against him.  Dkt. No. 76.  To establish a claim for fraud in the

inducement, a plaintiff must show "(i) a material misrepresentation of a presently existing or past

fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by appellants; and

(iv) resulting damages."  *State Street Global Advisors Trust Co. v. Visbal*, 431 F. Supp. 3d 322,

352 (S.D.N.Y. 2020) (internal quotation marks omitted) (quoting *Johnson v. Nextel*

*Communications, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011)).  Chiappone argues, *inter alia*, that

there is no evidence in the record suggesting that he made any statements he knew at the time to

be false and accordingly no evidence suggesting an intent to deceive.[4]  Because Plaintiff fails to

---

[4] Chiappone also argues that the fraud in the inducement claim is duplicative of the breach of
contract claim in Count I of the complaint.  "It is black letter law in New York that a claim for
common law fraud will not lie if the claim is duplicative of a claim for breach of contract."
*Nantong Sanhai Garment Co. v. Fab Mill Inc.*, 2022 WL 540756, at *4–5 (S.D.N.Y. Feb. 23,
2022) (internal quotation marks omitted) (quoting *Russell Pub. Group, Ltd. v. Brown Printing
Co.*, 2014 WL 1329144, at *3 (S.D.N.Y. April 3, 2014)).  "Nevertheless, 'under New York law,
parallel fraud and contract claims may be brought if the plaintiff (1) demonstrates a legal duty
separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation
that is collateral or extraneous to the contract; or (3) seeks special damages that are
unrecoverable as contract damages.'"  *Id.* (quoting *Merrill Lynch & Co. v. Allegheny Energy,
Inc.*, 500 F.3d 171, 183 (2d Cir. 2007)).  Moreover, "a fraud claim may be dismissed as
duplicative only as against a defendant against whom the related contract claim is viable."  *Wild
Bunch, SA v. Vendian Entertainment, LLC*, 256 F. Supp. 3d 497, 503 (S.D.N.Y. 2017) (internal
quotation marks and emphasis omitted) (quoting *Sun Prods. Corp. v. Bruch*, 507 F. App'x 46, 48
(2d Cir. 2013)).  Because the Court has held that no viable breach of contract claim lies against
Chiappone—*see* note 3, *supra*—the fraud in the inducement claim, asserted only against

point to any such evidence in opposing Chiappone's summary judgment motion, Chiappone is entitled to summary judgment. *See Jaramillo*, 536 F.3d at 145 (stating that, if the moving party meets its burden by pointing to the absence of evidence in the record, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment").

Congelados rests its claim on the evidence that after it delivered the lobster tails pursuant to Invoice No. 79, and prior to its shipment of the lobster tails pursuant to Invoice No. 92 and Invoice No. 94, Chiappone assured Congelados that the amount due on Invoice No. 79 would be paid.  Joint Statement ¶¶ 18–19 (citing Dkt. No. 77-1, Ex. 2 at 83:4–84:3).  Specifically, Congelados' principal Nunez testified that, in May or June 2017, Chiappone told him that he was working other business ventures to try to pay Congelados.  Dkt. No. 80-1 at 6.  Likewise, Chiappone testified that prior to entering into the transaction covered by Invoice No. 92, Nunez asked Chiappone for money and Chiappone responded that "[w]hen 3 Kids had money, we'll send him whatever we have, whatever we can."  Dkt. No. 77-2 at 29.  In arguing that "Chiappone *knowingly* misrepresented his or 3 Kids' intention to pay off the amount owed on Invoice No. 79 in order to induce Congelados to enter into the Invoice Nos. 92 and 94 contracts," Dkt. No. 80 at 13 (emphasis added), Congelados points only to evidence that the challenged reassurances were made, *id.*; evidence that 3 Kids wanted to continue its business relationship with Congelados, *id.*, and evidence that the promises to pay were not fulfilled, *id.* at 11–12.  In other words, Congelados' claim of scienter rests upon three things: (1) that the statements were made; (2) that 3 Kids and Chiappone had a motive to induce Congelados to continue engaging in their business relationship; and (3) that the invoices ultimately were not paid.  As a matter of law, none of these

---

Chiappone, cannot be dismissed as duplicative.

are sufficient—viewed individually or collectively—to support a finding that Chiappone made the challenged statements knowing that they were false and with the intent to defraud.  That the statements were made is plainly not sufficient to support such a finding.  With regard to motive, the only motive asserted by Plaintiff is that "Chiappone wanted Congelados to send it more lobster."  Dkt. No. 80 at 13.  However, in order to demonstrate fraudulent intent, "[m]otives that are generally possessed by most corporate directors and officers do not suffice," *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 494 (S.D.N.Y. 2017) (internal quotation marks omitted) (quoting *Bigsby v. Barclays Capital Real Estate, Inc.*, 170 F. Supp. 3d 568, 578 (S.D.N.Y. 2016)), and "[t]he mere fact that Defendants had a desire to see the company succeed does not provide a motive to engage in serious fraud," *Harrell v. Primedia, Inc.*, 2003 WL 21804840, at *3 (S.D.N.Y. Aug. 6, 2003).  The only motive alleged here is the motive to continue engaging in a beneficial business relationship with a supplier; as such, evidence of that motive is, as a matter of law, insufficient to support a finding of fraudulent intent.  Finally, with regard to evidence that the invoices were, ultimately, not paid, the law is clear that "a claim based upon statements of future intention"—such as the claim here, which based on promises to pay Invoice No. 79 in the future—"requires proof of a present intent to deceive."  *Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 222 (S.D.N.Y. 2007) (internal quotation marks omitted) (quoting *Marcraft Recreation Corp. v. Francis Devlin Co.*, 506 F. Supp. 1081, 1087 (S.D.N.Y. 1981)). "[M]ere failure to perform a previous promise is alone insufficient, as a matter of law, to raise an inference of intent to defraud at the time the promise was made."  *Id.* at 224–25.  Accordingly, in the absence of any evidence in the record that could support a finding of fraudulent intent, Chiappone is entitled to summary judgment on this claim.

**CONCLUSION**

Plaintiff's motion for summary judgment on Counts I and II is GRANTED IN PART and DENIED IN PART.   The Court grants summary judgment in Plaintiff's favor on Count I as against Defendant 3 Kids; any claim under Count I against Defendant Chiappone is dismissed, and Count II is dismissed in its entirety.   Chiappone's motion for summary judgment on Count III is GRANTED, and the count is dismissed.

The Clerk of Court is respectfully directed to close Dkt. Nos. 76 and 77 and to close the case.   Plaintiff is directed to submit a proposed judgment consistent with this Opinion and Order—and including prejudgment interest at the rate set forth 26 U.S.C. § 6621(a)(2)—by May 17, 2022.


SO ORDERED.


Dated: May 3, 2022
        New York, New York                                    _____
                                                              LEWIS J. LIMAN
                                                              United States District Judge